The State-Created Danger Doctrine is a deeply rooted part of Section 1983 jurisprudence. For decades, this Court and nearly every circuit have recognized this same basic constitutional principle. While the government ordinarily has no duty to protect the public from private violence, it cannot use its power to make people more vulnerable to that violence. Plaintiffs plausibly allege that here. This appeal turns on a basic distinction that runs through this Court's cases. On the one hand, failure to protect cases which are not actionable, and interference with protection cases which are. Starting with that first category, the first category includes cases like Castle Rock, Gray, Ruiz, and Ulrich. In those cases, government officials allegedly failed to prevent harm, failed to regulate, or failed to intervene before the harm occurred. Castle Rock involved, of course, officers who failed to intervene before a father tragically murdered his children. Ruiz involved negligent licensing and oversight of a daycare facility. Gray involved hospital policies that allegedly failed to protect a patient from medical risk. In each case, the government failed to reduce risk, but it did not use its official authority to make people more vulnerable to private violence. Now that second category. That second category is different. These are the interference with protection cases, Currier, Estate of BIC, Freeman, and Duarez. In those cases, state actors did not really fail to help. They used government authority to interfere with protective services otherwise available in the community, placing people in a more dangerous position than they otherwise would have occupied. In Currier, a state actor, Shirley Medina, told a mother to stop making reports of abuse. In Freeman, a police chief directed officers not to respond to domestic violence complaints. In Duarez, police officers allegedly told a group of counter-protesters that they could attack demonstrators with impunity. The common thread here is official conduct that made private violence more likely. Is more likely enough, or does it have to be immediate and to specific persons? Your Honor, under the case law, it has to be a substantial risk of serious, immediate, and proximate harm. And this was a central point in the brief, and so I want to address it here. The critical question is risk. It is not how long after the affirmative acts does the ultimate harm materialize. MacArthur makes that clear, and this court's case, Ulrich, makes that clear as well. So what about the question that Judge Phillips asked about whether it has to be to a specific person as opposed to just a general group of people out in the community? Your Honor, I believe there are two elements that are critically important here. The risk needs to be obvious or known, and the plaintiffs need to be members of a limited and specifically definable group. I'd like to talk about the danger here and the risk, which I think illustrate the point. The danger here, plaintiffs allege, the danger is not merely of gun violence in general. The danger is that individuals who intended to commit mass violence would retain firearms because deputies were effectively blocked from using the red flag law. And the risk was to a specifically and definable group, to vulnerable persons. Here, patrons of an LGBTQ nightclub, and that was foreseeable because Anderson-Ulrich, as plaintiffs alleged in their complaints, visited Club Q at least seven times in 2021 and 2022. And because LGBTQ patrons are more likely to be at risk of targeted mass violence. So patrons at that establishment have more protection than McDonald's or somewhere? Your Honor, I believe that patrons at Club Q did not have more protection at a practical level from a security perspective than at a place like McDonald's. But I do believe that patrons of McDonald's wouldn't fulfill the specifically and limited group under this court's case law. Do you have to tie that to the shooter, that the shooter had exhibited some animus or given some telltale signs that he indeed was targeting a specific population? Yes, Your Honor, I believe the risk was obvious or known. And I think about this in a twofold way. First, we can look at the public hearing on the county's resolution. This was in 2019. And the district attorney, District Attorney May, at the time said the red flag law could have been used to stop a mass shooting in the Colorado Springs community in 2015. That was a Halloween, Halloween Day massacre. So the risk was obvious or known at the time of the policy. In 2021, El Paso County committed affirmative acts. They responded to the scene of an alleged kidnapping. Anderson-Ulrich was holding his grandparents up at gunpoint. And they heard him say he wanted to become the next next mass shooter. So he took steps with respect to the arrest and the investigation. And at that point, the risk of targeted mass violence was already known. But the risk specifically with respect to Aldrich became known in that moment. And when the order of protection was dismissed in August 2022, just three months before the shooting, that risk became concrete, Your Honor. They kept his firearms as a result of that. Is that right or no? I believe that is correct, Your Honor. That is what we alleged in our complaints. And then he assembled more firearms in the interim. Yes, Your Honor. And so how would how would having the red flag have mattered if he can just go out there and get more firearms? The red flag law would have prevented Mr. Aldrich from temporarily possessing firearms. And we can look at a similar example in the same community as an illustration. And in 2022, as alleged in plaintiff's complaint, Colorado Springs Police Department officers sought an ERPO, an emergency risk protection order, to prevent a similar mass shooting in that community. This is alleged in plaintiff's complaint. The individual is referred to as RC and the supporting documentation is attached as exhibit A to plaintiff's complaints. In that case, the ERPO was entered and that individual was prevented from possessing firearms for 364 days. But for the county's affirmative acts in this case, Aldrich would have been prevented from possessing or buying firearms for 364 days. Prevented when he showed up at the gun shop and presented his identification, there would have been something that popped up on the screen that said, you can't sell to this person, that's what you mean. Yes, Your Honor, it would have been prevented the gunshot. But from a lawful perspective, an ERPO would have prevented him from possessing those. And I think we have every reason to believe that Aldrich would have followed the law. I think we assume that people follow the law, particularly at the pleading stage. But moreover, Your Honor, the day after the order of protection was dismissed, Mr. Aldrich called up El Paso County officials and asked for his guns to be released. He affirmatively took steps right after those charges were dismissed and right after the order of protection was dismissed. I guess I still struggle, even if Aldrich himself was a risk, in order for you to have a claim here, the risk has to be specific to a limited group. And it seems that you're arguing that all members of the LGBT community are at risk generally from mass shooters. Yes, Your Honor, I believe that members of the LGBT community and patrons of LGBT establishments are more vulnerable and are more at risk for targeted mass violence. But specifically here, Aldrich... Yes, Your Honor, I believe just that standing alone is not enough. But I do believe we have additional factors here, which is that Aldrich specifically said that he wanted to remain in this community and he wanted his mass shooting to occur in this community. But again, that would be the whole community, right? And that wouldn't be enough for the, you would agree, right? That for the state created danger. Yes, Judge, the entire Colorado Springs community would not be enough. OK, so you've also said that Aldrich went, I think, seven times to visit. Do the people who adopted the red flag law, is there any requirement that they have knowledge of that? Your Honor, we believe that at the pleading stage, El Paso County officials either knew or they should have known that Aldrich was visiting Club Q to plan his attack. These visits... How would they should have known that Aldrich was visiting Club Q? I don't see anything in the complaint that would give me that. Your Honor, because these visits began in 2021 when the criminal charges were pending. These visits went through when the criminal charges were dismissed and then even immediately afterwards. And specifically with respect to the limited and specifically definable group, I'd like to point this court to the Second Circuit's decision in Paynent versus DePrisco. This was cited in the party's briefing. And here the Second Circuit found that there was a plausible state created danger claim where police officers gave implicit assurances to a fellow officer that he could drink in excess and operate his vehicle after a shift. There, the specific and limited definable group were simply people on the road and pedestrians on the road, because that officer who ultimately was intoxicated, he hit several pedestrians and killed them. The Second Circuit found there to be a plausible state created danger claim there. I'd also like to talk... I see that I have four minutes remaining. If I could reserve the balance of my time for rebuttal. Thank you. You're welcome. May it please the court. Good morning, Your Honors. Nathan Whitney on behalf of the county defendants. I am arguing with Mr. Kuhn, who is counsel for the club of appellees, and I'll try and reserve a little bit of time for him as well. The facts of this case are undeniably tragic, but as the Supreme Court made clear in Janie v. Winnebago County, tragic facts alone do not make out a 14th Amendment violation. Such is the case here. Plaintiffs are all victims of the horrific shooting in Club Q that occurred in November of 2022. They are seeking to hold the county defendants liable under the state created danger doctrine, which first requires them to show affirmative conduct. This court has defined affirmative conduct to mean conduct that imposes an immediate threat of harm, immediate threat of harm that has a limited duration and is directed at a discreet plaintiff rather than the public at large. There are three criteria this court has set out to show affirmative conduct. Plaintiffs' claims falter at this first hurdle. Plaintiffs essentially argue that the Club Q shooting would not have occurred if the county defendants had sought an extreme risk protection order against Aldrich following their arrest in 2021 on unrelated criminal charges. In pages 10 through 12 of the second brief, I've done my best to lay out those allegations of inaction. The complaint is full of allegations that the county failed to act. The county failed to take steps to prevent the shooting. The county failed to act. This is a classic case of inaction, which cannot suffice to show a claim under the state created danger. The county took an action in that the county made the affirmative decision not to enforce the red flag law. Justice McHugh, and you jump to the next point. I'm just a judge, not a justice. Thank you, Judge McHugh. My only says no amount of wordsmithing can change this. And the closest the plaintiffs come are when they talk about the enactment of the resolution in 2019 and the sheriff's statement that was issued in 2020. And while those may be affirmative acts in the broader sense of the word, they don't meet this court's definition of affirmative conduct. There are a couple of reasons why. Gray v. University of Colorado Hospital Authority, I think is dispositive on this issue. In that case, there was a patient who was at the hospital seeking seizure treatment and the patient was told he wouldn't be left alone. The patient was left alone, I think, fell and was injured and sued, saying that the hospital's policy of leaving patients unattended caused the risk of his injury. In that case, the 10th Circuit said the implementation of generally applicable policies don't foist upon anyone an immediate threat of harm with limited duration and scope. Generally applicable policies simply aren't affirmative conduct because they are open ended and they apply to everyone. In that case, that policy was actually a little bit narrower than the general public. It applied to all EMU, emergency medical unit patients. Even with that narrowing, it was still too broad to establish affirmative conduct. As well, Ruiz v. McDonald involved a case about daycare licensure. Plaintiffs had sued the state for issuing a daycare licensure to individuals with criminal histories. The state didn't detect those when they did a background check. The parents then took their children to the daycare where they were abused and injured. And the court right there also found that that licensure applied to the public at large or all participants in the daycare. Also, we're not talking about hospital policies. We're talking about policies that were implemented by locally elected officials. The Board of County Commissioners are all locally elected county officials. The sheriff is a locally elected county official as well. And they're making policy decisions about the use of local resources at the core. And this court and the Supreme Court has also indicated in cases like Collins that those locally elected decisions, those policy decisions shouldn't generally be second guessed by this court. For those reasons, we believe that the allegations related to the policy, the resolution, the statement are simply insufficient to establish affirmative conduct. And that's highlighted by the timeline of this case. We have a very prolonged timeline that really takes place over three years. The argument that you made there almost raises the specter of the county having to spend money. Resources, I think, is the word that you use. But here it's simply a matter of entering someone into a computer system, isn't it? And as far as whether it's an affirmative act or not, the resolution says we'll actively resist the red flag law, which suggests something more than we're not going to pursue that. Judge Phillips, I will concede that's what the resolution states, but the complaint is devoid of any active. First, let me back up and say, number one, this resolution was passed by the Board of County Commissioners at a point in time when the red flag law had not yet been acted. So it was somewhat of a commentary on a pending piece of legislation at the time. But once that law was passed, the complaint is still devoid of any plausible allegations showing that the sheriff's office, which is the law enforcement agency in the county, actively resisted the implementation of a protection order here. The sheriff's statement is different than the resolution. The sheriff is the law enforcement officer in the statement that he issued discussed the limited circumstances under which his office would seek a protection order. So it wasn't carte blanche. We won't do it. The sheriff did allow for limited circumstances under which his deputies might pursue a red flag protection order. Probable cause of a crime. Correct. So is your bottom line that this is an electoral question? If you don't like your county officials and their positions, then vote them out and get someone else. So I have two arguments. One, obviously, there was no affirmative conduct, but I believe the court does need to provide deference to locally elected officials because different jurisdictions are going to have different electorates with different priorities, different points that they want their elected officials to advocate for. So, yes, and I think that's what the Supreme Court guidance would say in Collins is this is a elected official function rather than a court function to second guess whether that resolution was correct, wise, with the benefit of hindsight here. Let me ask you about the limited group portion of the affirmative conduct definition. One of the things they bring out is that Aldridge visited this specific nightclub repeatedly and their allegation is casing the joint, checking out security. Is how does that fact play in to the analysis here? So, number one, I do not believe there are any plausible allegations indicating that any of the county defendants had knowledge of any of this. I think that was all information that was gleaned in the investigation after the shooting, even if the county had been aware of that. Which I don't believe any county official was and they didn't do anything about it. That's still not affirmative conduct. It may be deplorable in hindsight. It may be regrettable. But if you look back to the Deshaney case, the Supreme Court said, yeah, you have to. We don't have a duty to protect individuals from harm by third parties. And if we impose an obligation on the government to act simply when we have notice of potential harm by a third party, the liability would be endless. And I will end with one final point here to leave my colleague a little bit of time for his argument. What my friends on the other side are trying to do here is impose a constitutional violation based off the red flag statute when the statute itself doesn't even impose a tort duty on my client. The Supreme Court has repeatedly said the substance due process provision of the 14th Amendment should not be used as a font for tort law. Those are decisions that are left to the state court to make. Is this your Dobbs argument? This is this is not right on the Dobbs argument. But I wanted to highlight that one section of the red flag protection order 13-4.5-113 subsection 4 says the red flag order does not require a law enforcement officer or agency to file a petition for a temporary emergency risk protection order or a petition for an extreme risk protection order. So there is no tort duty. There is no duty imposed by Colorado statutory law. And I don't believe there's any duty imposed to act under these circumstances under Colorado common law, tort law. So what my friends on the other side are trying to fashion a constitutional violation, a violation of the substantive due process provisions of the 14th Amendment when there isn't even a violation or a duty owed under state tort law. And Judge McHugh, I'll finally just bring up the following point. I did raise a new argument and I will concede that about the Dobbs decision. And where does the state created danger doctrine come from? I will concede I was not quite smart enough to raise that in the trial court. It came to my attention as I was briefing. So if I if I waive that, I waive that. But that is a question that I believe at some point this court is going to have to address. Whether it's this case or another case, this court, I believe, is going to have to ask itself, where did this doctrine come from? Is it deeply rooted in our nation's history or does it come from two stray sentences Dushaney that suggest possibly the Supreme Court left open the door for this type of liability? I don't think the court needs to answer that question today to resolve this case because there clearly is a failure to allege affirmative conduct. But whether it's this case or another case in the future, I believe the court will need to address that question. Thank you, judges. And with that time, I'm going to reserve a whole three minutes and twenty four seconds for our colleague, Mr. Kuhn. Mr. Kuhn, I assume you're dealing with whether the district court correctly held that the negligence and wrongful death claims were not preempted by the CPLA. Is that that? And primarily, Your Honor, I think the first question the court has to determine is whether or not the trial court had supplemental jurisdiction. And our position is that it did not. Under Gibbs, there has to be a common nucleus of operative fact between the claims. And second, they must be the type of claims that a plaintiff would ordinarily expect to try in the same proceeding. And Your Honor, admittedly, the claims against Club Q and the claims against the county share some general background information, such as the identity of the shooter. They might even share some distant link in the but for a causal chain. But a mere commonality is not sufficient for supplemental jurisdiction. Gibbs commands that the facts be the operative facts, meaning those facts giving rise to liability and that you would use to prove your case. Well, can we first you don't cite any cases that support the argument that a federal court's exercise of subject matter jurisdiction over a case that is nonetheless dismissed is sufficient to create an injury on your behalf that would be redressed on appeal? With respect, Your Honor, our position is that the district court couldn't decline something for us that it didn't have and that the Club Q parties were injured as a consequence, in part because the tolling that you get under Section 1367 is only applicable if the court declined supplemental jurisdiction. And because the court never had jurisdiction, it couldn't have declined it and had would dismissed under 12B1 and thus the claims would be time barred. And as a consequence, we have been injured because there is now newly filed litigation in El Paso County for the claims over which the trial court purported to decline supplemental jurisdiction. Well, couldn't under 1367D, couldn't, didn't they have the plaintiffs have a right to commence a new action within 90 days in any, either way, it was dismissed? Our position is that Section D says the period of limitations for any claim asserted under subsection A. Our position is asserted means where the court has supplemental jurisdiction over the claims. I submit that you couldn't simply allege any sort of claim in federal court to avail yourself of the benefits of tolling under Section D, that there must have been jurisdiction in the first instance. And I, you know, being that of 30 seconds left, I would just point the court to the third circuit's opinion in Leon, where the court said that, look, general background facts aren't sufficient for supplemental jurisdiction. And additionally, the DC circuit not cited our case. It's very recent opinion, Joyner versus Morrison-Forsetter holds, stands for the same proposition. Can you give a site for that? Yes, ma'am. It is 140 F 4th 523. And with that, Your Honor, do you contend that the 2022 amendment to the CPLA requires a dismissal for any mass shooting? Your Honor, I see I'm out of time. Is it all right if I take a minute to answer that question? As much time as you need. Well, don't. Careful what you. Your Honor, our position, it does not create a categorical rule. What the amendment says is. That courts cannot consider, excuse me, that the Rocky Mountain Planned Parenthood case should be disregarded to the extent it allows landowner liability without considering whether a third party criminal act was the predominant cause of the harm. And the statute importantly says, as noted by the dissenting justices and judge. And so in the Planned Parenthood case, what the dissenting justices said is that the premeditated and intentional actions of a mass shooter are the predominant cause of the injury he inflicts, such that any negligence on the part of the property owner simply is not a substantial factor. So is it a yes or a no? That you could, there could be certain criminal acts where you could be considered. But in the context of mass shooting cases, the Colorado Supreme Court has said as a OK, well, thank you very much. And thank you, Your Honor. We all have to be careful because whatever you overrun, I give the other side that time as well. So you'll have an extra minute and 30, but you don't have to use it. Thank you, Judge. I'll do my best to be brief. I'd like to start by talking about resources and deference. We heard a lot about resources and deference from my friend's argument. And my friend talked about Gray and Ruiz. Again, Gray and Ruiz are about a failure to protect. These are about a failure to regulate and a failure to mitigate risk. My friend also began predictably by talking about Deshaney. Of course, Deshaney being a case where children were left in the custody of a parent who was dangerous and the government officials didn't do anything. I'd like to point this court to Freeman versus Ferguson, which was relied upon in this court's decision, Currier versus Doran. And in Freeman, the police chief told his officers don't respond to domestic violence complaints. And that is where this court has drawn the line, where there's an interference with protection that is constitutionally significant. Now, let's talk about resources and deference. There was no discussion of resources at the public hearing for the resolution, for the red flag resolution. No, no discussion at all. Resources are about where to deploy officers and which calls to prioritize. Resources, they can't hide behind resources when they interfere with protective services otherwise available to community. That is the line that Currier drew. With respect to deference, county officials are required to follow the law. County officials are also required to defer to the legislature, and that's what they should have done here. Now, the other side calls this a classic case of inaction and no amount of wordsmithing can change this. But Judge Phillips, as you correctly pointed out, county officials said that they would actively resist the red flag law. There is official action here, and, Your Honor, I would just point to Governor Paulus' statements after the Club Q shooting. Governor Paulus said himself that this is an instance when the red flag law could have and should have been used and it would have prevented this tragedy. But for the county's affirmative acts, their active resistance, their active interference with the law, this tragedy would have been stopped. I'd like to just briefly address the supplemental jurisdiction point. My friend on the other side said that plaintiff's claims share general background information. What I think my friend may have overlooked is that that general background information includes wrongful conduct that contributed to the same deaths and injuries. That is five deaths and 25 injuries. I would ask this court to look to the Fifth Circuit's decision in Feigler versus Tidex, where a plaintiff was injured off the coast of Nigeria. He injured his back. Upon coming home from the airport, he got into a car accident and he filed suit in federal court. And that motor vehicle accident was a state law claim that was appended to the federal claim. And the Fifth Circuit, on the issue of supplemental jurisdiction, said, yeah, there's supplemental jurisdiction here. These are totally different injuries. These are, excuse me, totally different causes of action that occurred in entirely different places. But they contributed to the same injury. And therefore, they should be tried together. The jury should be, they should be entitled to look to all of the factors that led to the injury. And that Feigler decision was relied upon last year by a district court sitting in the Eighth Circuit in Wiley versus Fleet Farm in a shooting case involving a gun retailer and claims against a bar for negligent security. I would say that there is, as this court just noted, no case law support for my friend's position. Deny the request to rewrite district court's decision, please. Furthermore, I think my friend just recognized that there is no categorical, no categorical pleading stage rule under the 2022 amendment to the CPLA. The 2022 amendment to the CPLA had a narrow corrective intent. It merely tried to echo Justice Hart's concerns that the Wagner majority might rewrite proximate cause framework under Colorado law. With that, same duty of care for the negligence as well as the CPLA claim. Yes, Judge, except that the negligence and CPLA relate to different conditions, one just conditions on the land, the other one to operational negligence. Further questions? All right. Thank you, counsel. Thank you. And thank you to all counsel for your very helpful briefing. The case is submitted and counsel are excused.